# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

Plaintiff,

V.                                                    No. CR 07-2438 MCA

**JESUS DOMINGUEZ-LOPEZ**,

Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER came before the Court on a bench trial on February 29, 2008, following the Defendant's unopposed, knowing, and voluntary written waiver of his right to a jury trial, and the Government's filing of a *Motion in Limine* [Doc. 21] to exclude evidence of "constant surveillance." Having considered the evidence admitted at trial, the arguments of counsel, the relevant law, and being fully advised in the premises, the Court denies the Government's *Motion in Limine* and finds the Defendant, Jesus Dominguez-Lopez, **GUILTY** of the crime of illegal reentry as charged in the *Indictment* [Doc. 11], pursuant to the following special findings of fact and conclusions of law which are entered pursuant to Fed. R. Crim. P. 23(c).

## I.   SPECIAL FINDINGS OF FACT PURSUANT TO FED. R. CRIM. P. 23(C)

1.   Before trial, Defendant knowingly and voluntarily waived his right to a jury trial in writing with the Government's consent and the Court's approval pursuant to Fed. R. Crim. P. 23(a).

2.   The parties have entered into the following stipulations of fact which are

accepted as true and proven beyond a reasonable doubt:

        a.      The Defendant does not have legal status in the United States and is in fact illegally in the United States.

        b.      The Defendant did not have authorization to reenter the United States at the time he was apprehended on September 17, 2007; and

        c.      The Defendant was deported prior to September 17, 2007.

3.      During his trial testimony, Defendant also testified that:

        a.      he is a citizen of Mexico;

        b.      he knew that he could not legally return to the United States;

        c.      he was apprehended by officials from the United States on the night of September 17, 2007;

        d.      prior to his apprehension, he had jumped the border fence separating Mexico from the United States and walked a distance of about 30 steps; and

        e.      he had consumed some alcohol prior to jumping the fence.

4.      I find beyond a reasonable doubt that Defendant's act of jumping the border fence and walking into the United States was knowing and intentional, notwithstanding any consumption of alcoholic beverages that he claims may have affected his memory of these events.

5.      The border fence to which Defendant referred in his trial testimony spans a 1.2-mile section of the border located in or adjacent to Sunland Park, New Mexico.

6.      Immediately adjacent to this section of border fence on the United States side of the border is an area of unobstructed flat terrain with a set of railroad tracks running

parallel to the border.

7.     About thirty steps away from the border fence, this flat area with railroad tracks comes to an end, and the terrain drops into an open, hilly desert criss-crossed with dirt paths and arroyos.

8.     The 1.2-mile section of border fence described above, as well as the railroad tracks and portions of the open desert adjacent to it on the United States side of the border, are regularly monitored by agents of the United States Border Patrol from a location known as "Monument Mesa" located approximately three miles away.

9.     Such regular monitoring is conducted by means of a pole-mounted infra-red camera mounted in the back of a Border Patrol pickup truck, which sends a signal to a screen located in the cab of the truck.

10.     Human beings or animals detected on this infra-red camera appear on the screen as a thermal image which looks like a silhouette figure in black and white.

11.     While the infra-red camera on Monument Mesa has a radius of four miles and can pan 270 degrees from left to right, the desert in this area also contains "blind spots" in which the camera cannot detect the presence of human beings due to the undulating terrain.

12.     One of these "blind spots" exists in an area behind Picnic Hill, which is adjacent to a portion of the 1.2-mile section of border fence and railroad tracks referenced above.

13.     On or about the night-time hours of September 17, 2007, Agent Juan Hernandez was operating the infra-red camera and monitoring the screen from the cab of his Border Patrol pickup truck on Monument Mesa, approximately three miles from the section

of border fence that Defendant jumped.

14.     During that time, Agent Hernandez saw that the infra-red camera detected thermal images of  two individuals, one of whom was later identified on the scene as Defendant, as they jumped the border fence and began walking into the United States.

15.     From his vantage point three miles away in the cab of the Border Patrol pickup truck on Monument Mesa, Agent Hernandez was not capable of apprehending any individuals who had just jumped the 1.2-mile section of border fence referenced above, because he was too far away.

16.     Accordingly, the detection of thermal images on the screen of his infra-red camera caused Agent Hernandez to contact, via radio communication, other Border Patrol agents stationed closer to the border and to direct them toward the area where the two individuals jumped the border fence and began walking into the United States.

17.     Before Agent Hernandez had summoned their assistance, given them directions to the area in question, and allowed them a brief period of time in which to transport themselves to that area, no other Border Patrol agents were in the immediate area of where Defendant was located, and no other Border Patrol agents were in a position to apprehend the individuals whose thermal images appeared on the screen of the infra-red camera stationed three miles away on Monument Mesa.

18.     From the moment Defendant jumped the fence until the moment of his apprehension, there was a brief but discrete interval of time during which Defendant's path across the railroad tracks and into the open desert was unobstructed by physical barriers or the physical presence of Border Patrol agents; during that interval he was able to move freely

4

within the United States under cover of darkness regardless of whether his thermal image constantly appeared in the monitoring screen of the infra-red camera stationed three miles away on Monument Mesa.

19.     Under the circumstances described above, Defendant was physically present in the United States and free from "official restraint" for a brief but discrete interval of time before Border Patrol agents apprehended him on or about September 17, 2007.

20.     The Government has met its burden of proving each essential element of the crime charged in the *Indictment* beyond a reasonable doubt, and Defendant is guilty of that crime.

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.     Burden of Proof At Trial

Although this case was tried to the Court rather than to a jury, the following legal standards still apply.  First, the Defendant is presumed by the law to be innocent.  The law does not require a Defendant in a criminal case to prove the Defendant's innocence or to testify or to produce any evidence at all.  The Government has the burden of proving the Defendant's guilt beyond a reasonable doubt, and if it fails to do so I must acquit the Defendant.

Proof beyond a reasonable doubt is proof that leaves the factfinder firmly convinced of the Defendant's guilt.  There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.  It is only required that the Government's proof exclude any "reasonable doubt" concerning the Defendant's guilt.  A reasonable doubt is a doubt based on reason and

common sense after careful and impartial consideration of all the evidence in the case.  If, based on my consideration of the evidence, I am firmly convinced that the Defendant is guilty of the crime charged, I must find him guilty.  If on the other hand, I think there is a real possibility that he is not guilty, I must give him the benefit of the doubt and find him not guilty.

In determining the facts, I consider only the evidence I have admitted in the case.  I also draw such reasonable inferences from the evidence as are justified in the light of common experience.

It follows that even though the burden of proof always rests on the Government as to all elements of the charged offense, I need not consider defense theories which are speculative and unsupported by any admissible evidence.  See United States v. Castellanos-Garcia, 270 F.3d 773, 775-76 (9th Cir. 2001); accord United States v. Bindley, 157 F.3d 1235, 1241 (10th Cir. 1998) (collecting cases). But "when evidence has been produced of a defense which, if accepted by the trier of fact, would negate an element of the offense, the government must bear the ultimate burden of persuasion on that element, including disproving the defense."  United States v. Unser, 165 F.3d 755, 764 (10th Cir. 1999) (citing Mullaney v. Wilbur, 421 U.S. 684 (1975), and 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 1.8(c) (1986)).

In determining whether the Government has met its ultimate burden of persuasion, I weigh the witnesses' testimony by considering each witness' relationship to the Government or the Defendant; interest, if any, in the outcome of the case; manner of testifying; opportunity to observe or acquire knowledge concerning the facts about which the witness

testified; candor, fairness and intelligence; and the extent to which the testimony of the witness has been supported or contradicted by other credible evidence.

I further recognize that the Defendant is not on trial for any act or conduct or offense not alleged in the *Indictment*, nor am I called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a Defendant in this case. Also, the punishment provided by law for the offense charged in the *Indictment* is not to be considered in any way in arriving at an impartial verdict as to the guilt or innocence of the Defendant.

### B.   Essential Elements of the Offense

The *Indictment* [Doc. 11] charges Defendant with illegal reentry of a deported alien in violation of 8 U.S.C. §§ 1326(a) and 1326(b). I enter special findings pursuant to Fed. R. Crim. P. 23(c) with respect to each of the essential elements of this offense in order to afford a basis for appellate review, taking into account the parties' contention that this case may present an issue of first impression in this circuit. See generally United States v. Rinke, 778 F.2d 581, 586 (10th Cir. 1985); United States v. Milton, 421 F.2d 586, 587 (10th Cir. 1970).

To find the Defendant guilty of the crime charged in the *Indictment*, I must be convinced that the Government has proved each of the following beyond a reasonable doubt:

> *First*: the Defendant was an alien at the time alleged in the *Indictment* (*i.e.*, the Defendant was not a citizen or national of the United States on or about September 17, 2007);

> *Second*: the Defendant had previously been excluded, deported, or removed from the United States;

> *Third*: the Defendant knowingly was found in the United States on or about the date alleged in the *Indictment*; and

*Fourth:* the Defendant had not received the consent of the proper legal authority to reapply for admission to the United States.

See Tenth Circuit Criminal Pattern Jury Instruction 2.05 (Feb. 2006); United States v. Martinez-Morel, 118 F.3d 710, 713 (10th Cir. 1997); United States v. Miranda-Enriquez, 842 F.2d 1211, 1212 (10th Cir. 1988); United States v. Meraz-Valeta, 26 F.3d 992, 997 (10th Cir. 1994), overruled in part on other grounds, United States v. Aguirre-Tello, 353 F.3d 1199 (10th Cir. 2004) (en banc); United States v. Figueroa, 221 F.3d 1353, 2000 WL 963346, at *5 (10th Cir. 2000) (unpublished disposition); United States v. Hernandez-Noriega, 118 Fed. Appx. 458, 460 (10th Cir. 2004) (unpublished disposition), judgment vacated on other grounds, 544 U.S. 995 (2005).

The parties' stipulations entered on the record at trial, in combination with the admissions contained in Defendant's trial testimony, support a reasonable inference that on or about September 17, 2007:  (1)  the Defendant was an alien, that is, a person who is not a citizen or national of the United States, (2)  the Defendant had previously been deported, excluded, or removed from the United States, and he had departed the United States while an Order of Exclusion, Deportation, or Removal was outstanding, and (3) the Defendant had not received the consent of the proper legal authority (*i.e.*, the Secretary for Homeland Security) to reapply for admission to the United States.  I therefore conclude that the Government has met its burden of proving the first, second, and fourth elements of the offense charged in the *Indictment* beyond a reasonable doubt.

### C.    Whether Defendant Was "Found in the United States"

The central disputed issue in this case is whether the Government has satisfied its

burden of proof as to the third element of the offense, *i.e.*, whether the Defendant knowingly "was found in the United States" on or about September 17, 2007.  The resolution of this issue is not straightforward because courts have not equated the phrase "found in the United States," as used in 8 U.S.C. § 1326, with mere physical presence inside the borders of this country.  Rather, this phrase has evolved into a term of art that is intertwined with several other concepts specific to the field of *immigration law*.  Defendant asks that the most expansive definition of the term "found in the United States," found in the law of the Ninth Circuit, be applied in this case.  I decline to do so.

The Tenth Circuit has stated that "[t]he 'found in' language of § 1326(a) informs an alien who has been previously deported and returns to the United States without the permission of the Attorney General that he or she will be deemed guilty of an offense upon discovery within the United States."  Meraz-Valeta, 26 F.3d at 997 (citing United States v. Whittaker, 999 F.2d 38, 42 (2d Cir. 1993)).  In this respect, the "found in" language presupposes that the alien's discovery within the United States is preceded by some form of "surreptitious entry" by which the alien passes into the United States.  See id. (citing United States v. DiSantillo, 615 F.2d 128, 135 (3d Cir. 1980)); United States v. Bencomo-Castillo, 176 F.3d 1300, 1303-04 (10th Cir. 1999).  And while "section 1326 requires no showing of specific intent, '[t]here still must be the general intent to do the prohibited act, to-wit enter.'"  Miranda-Enriquez, 842 F.2d at 1212 (quoting Pena-Cabanillas v. United States, 394 F.2d 785, 790 (9th Cir. 1968)); accord United States v. Gutierrez-Gonzalez, 184 F.3d 1160, 1165 (10th Cir. 1999); Martinez-Morel, 118 F.3d at 713; United States v. Galindo, 102 Fed. Appx. 637, 639 (10th Cir. 2004) (unpublished disposition).  Thus, for example, an alien would not

be guilty of the offense of "being found in the United States" if he "'was drugged and carried across the line.'"  Miranda-Enriquez, 842 F.2d at 1212 (quoting Pena-Cabanillas, 394 F.2d at 790).

To the extent that an alien must first intentionally commit the prohibited act of entering the United States before he or she can be "found in the United States" within the meaning of 8 U.S.C. § 1326, the Court must further examine what it means to "enter" the United States for immigration purposes.  See United States v. Pacheco-Medina, 212 F.3d 1162, 1165-66 (9th Cir. 2000).  In this context, "[m]ost courts that have construed this term have concluded that 'entry' is not accomplished until physical presence of an alien in this country is accompanied by freedom from official restraint."  United States v. Kavazanjian, 623 F.2d 730, 736 (1st Cir. 1980); accord United States v. Cardenas-Alvarez, 987 F.2d 1129, 1133 (5th Cir. 1993); see, e.g., Correa v. Thornburgh, 901 F.2d 1166, 1171 (2nd Cir. 1990); Cheng v. INS, 534 F.2d 1018, 1019 (2d Cir. 1976); In re Pierre, 14 I. & N. Dec. 467, 468-69 (1973).

The notion that "entry" for immigration purposes necessarily involves some "freedom from official restraint" has a long lineage going back one hundred years into the last century to the case of Ex Parte Chow Chok, 161 F. 627, 630 (N.D.N.Y.), aff'd, 163 F. 1021 (2d Cir. 1908).  In that case, the district court held that aliens "were not 'found' unlawfully in the United States" within the meaning of the statute in effect at that time, "but were found before they reached the border and at the border line," such that "on entering [the United States, they] were at once surrounded by officers, silently taken in charge, in effect arrested, and from that time effectively deprived of their liberty and prevented from going at large within

10

the United States."  Id. at 630.  This concept was later adapted to circumstances such as the "customs enclosure" in an airport, or the designated path of travel at an official border-crossing station, where persons crossing the border are essentially *surrounded* at close range by government agents, physical barriers, or other signs of an official government presence that direct their course of travel during the entire time that they are present in the United States.  See, e.g., Correa, 901 F.2d at 1172.

More recent case law has expanded the notion of "official restraint" to include situations that do not amount to a formal arrest or seizure within the meaning of the Fourth Amendment.  See Pacheco-Medina, 212 F.3d at 1165 n.5.  In 1990, for example, the Second Circuit defined "freedom from official restraint" to mean "that the alien who is attempting entry is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on."  Correa, 901 F.2d at 1172.  This definition was intended to encompass common situations at border stations or ports of entry where an alien may not be formally detained by means of physical force or a show of authority (as would ordinarily be required to constitute a seizure for Fourth Amendment purposes) but is nevertheless "constrained" by government action to a significant degree, *e.g.*, by the alien's presence in a "Customs Enclosure" at an airport where egress is restricted.  See id.  Under this definition, "'[a]n alien who crosses the border at a designated location and proceeds directly in the manner designated by the government to the border station where he then presents himself to the authorities has not [yet] been "found in" the United States.'"  United States v. Cruz-Escoto, 476 F.3d 1081, 1085 (9th Cir. 2007) (quoting United States v. Zavala-Mendez, 411 F.3d 1116, 1121 (9th Cir. 2005)).

Perhaps the most expansive definition of "official restraint" is found in the Ninth Circuit, where "[i]t is well established . . . that official restraint includes constant governmental observation or surveillance from the moment of entry, and that those who are under such surveillance for the entire time they are present cannot be found to have entered the United States for purposes of § 1326." United States v. Bello-Bahena, 411 F.3d 1083, 1087 (9th Cir. 2005). Under this definition, "[c]onstant surveillance will bar conviction even if the alien is unaware that he is being observed and even if he is arrested at a point 'well past the point of entry.'" Id. (quoting United States v. Ruiz-Lopez, 234 F.3d 445, 448 (9th Cir. 2000)). Of course, none of the Ninth Circuit opinions cited above are binding precedent in this Court, and the parties have provided no authority to indicate whether or in what form the Tenth Circuit has adopted or would adopt the Ninth Circuit's "constant surveillance" rule. Nevertheless, Defendant urges this Court to adopt the Ninth Circuit rule in its most expansive form and apply it to find that Defendant was not "found in the United States" within the meaning of 8 U.S.C. § 1326. [Doc. 17.]

The exact parameters of the Ninth Circuit's "constant surveillance" rule remain disputed or unresolved in some respects. For example, the Ninth Circuit permits a jury to find that an alien is free from official restraint, and has therefore entered the United States for purposes of 8 U.S.C. § 1326, when he or she "evades the government's detection . . . for a brief period of time," but the same is not true when the break in surveillance only lasts for "a number of seconds." Id. Parties also may dispute whether certain forms of technology are sufficient to constitute "constant surveillance" under the rule. See, e.g., United States v. Vela-Robles, 397 F.3d 786, 789 (9th Cir. 2005) (declining "to extend the scope of the rule

to cover a person who has merely tripped a seismic sensor"); United States v. Murillo-Betancourt, 185 Fed. Appx. 632, 633 (9th Cir. 2006) (unpublished disposition discussing the presence or absence of cameras and "infrared scopes").

Another disputed issue is whether the "constant surveillance" of the alien must be accomplished "by one or more agents who is or are *reasonably able to apprehend him* after he has crossed the border." Bello-Bahena, 411 F.3d at 1089 (emphasis added). In Bello-Bahena, a panel of the Ninth Circuit reversed a conviction for failure to include a requested jury instruction containing this requirement, emphasizing that "'an alien must be in the visual or physical *grasp* of the authorities at all times' to show that he or she is under official restraint." Id. at 1091 (quoting Vela-Robles, 397 F.3d 789) (emphasis added). In another case, however, a panel member dissented on the grounds that a jury instruction requiring "observation 'by an agent who is reasonably able to apprehend the alien'" is "a concept which appears nowhere in this circuit's jurisprudence." United States v. Hernandez-Garcia, 284 F.3d 1135, 1142 (9th Cir. 2002) (Rawlinson, J., dissenting).

Finally, there is a dispute within the Ninth Circuit as to whether surveillance must be constant when an alien is otherwise constrained by physical barriers (such as canyons or cement drainage structures) which have only one point of egress into the United States that is blocked by government agents, such that the alien's capture is, for all practical purposes, inevitable unless he or she decides to return to Mexico. In one case, a panel of the Ninth Circuit concluded that in the absence of constant surveillance, official restraint could not reasonably be inferred even though the alien in question "may have difficulty escaping" because he entered this country through "a natural gorge" with "only two practical ways

out." Vela-Robles, 397 F.3d at 789.  The question of physical barriers arose again in Cruz-Escoto, 476 F.3d at 1084, which involved the apprehension of an alien in a border area known as "the Channel" consisting of "a cement river bed that runs north from Mexico into the United States" and is fenced along areas of its southern bank.  Id.  In that case, a majority of the panel concluded that the alien was not under "official restraint" regardless of the "complicating fact" presented by "the geography of the Channel." Id. at 1086.  But the dissenting panel member argued that "the configuration of the Channel and the permanent Border Patrol post at that location placed [the alien] under official restraint from the moment he crossed into the United States until he was apprehended." Id. at 1091 (Tashima, J., dissenting).

The Government's counsel argues against adoption of the Ninth Circuit rule, noting that to the best of his knowledge, no other circuit court has followed the Ninth Circuit's equation of "constant surveillance" with "official restraint." [Doc. 18.]  In its *Motion in Limine* [Doc. 21], the Government also asks the Court to go a step further and exclude evidence of "constant surveillance" on the grounds that it is irrelevant to the Court's determination of whether Defendant was "found in the United States." [Doc. 21.]

After considering the parties' arguments, the evidence presented at trial, and the authorities discussed above, I reject the Ninth Circuit's interpretation which equates "official restraint" with "constant surveillance" for the purpose of determining when an alien has "entered" the United States within the meaning of 8 U.S.C. § 1326.  While evidence of surveillance by government agents may be relevant to determining whether Defendant "entered" the United States within the meaning of that statute, I conclude that "constant

surveillance" cannot always be equated with "official restraint."

In reaching this conclusion, I accept the underlying premise that to be "found in the United States" under 8 U.S.C. § 1326, an alien must first have committed the intentional act of entering the United States.  See Pacheco-Medina, 212 F.3d at 1165-66.  I believe this is consistent with established law in the Tenth Circuit, which construes the statute's "found in" language as presupposing that an alien's discovery within the United States is preceded by some form of "surreptitious entry," Meraz-Valeta, 26 F.3d at 997, which in turn requires "'the general intent to do the prohibited act, to-wit enter.'"  Miranda-Enriquez, 842 F.2d at 1212 (quoting Pena-Cabanillas, 394 F.2d at 790); accord Gutierrez-Gonzalez, 184 F.3d at 1165; Bencomo-Castillo, 176 F.3d at 1303-04; Martinez-Morel, 118 F.3d at 713; Galindo, 102 Fed. Appx. at 639.

I also accept the well-established premise from other circuits that the concept of "entry" for immigration purposes "is not accomplished until physical presence of an alien in this country is accompanied by freedom from official restraint."  Kavazanjian, 623 F.2d at 736.   See also, e.g., Cardenas-Alvarez, 987 F.2d at 1133;  Correa, 901 F.2d at 1171; Cheng, 534 F.2d at 1019; In re Pierre, 14 I. & N. Dec. at 468-69.

It does not necessarily follow, however, that the term "official restraint" must be equated with "constant surveillance" by a government agent.  Significant advances in technology have changed what it means to be under "surveillance" in this 21st Century, both from the perspective of the observer and the one observed.

In my view, it does not make sense to expand the concept of "official restraint" to cover situations where the aliens in question are *not*, in any sense, surrounded by government

agents at close range, and where technology has advanced to the point that large expanses of the border can be kept under some automated form of surveillance at all hours from a remote location several miles away that is staffed by a single agent. Such automated surveillance systems were never even imagined at the time <u>Chow Chok</u> was decided in 1908.

Even when the surveillance is constant, persons traveling through an open desert whose images are detected through the type of remote or automated device used in this case are not thereby subjected to "official restraint" in the same sense that applies to persons in a "customs enclosure" at an airport or persons who are "surrounded by officers" at close range where it is possible to establish face-to-face visual contact. In the context presented here, the agent performing the surveillance is not in a position to identify or apprehend the alien by virtue of the data retrieved from that surveillance alone. Rather, the agent performing the surveillance must relay that data to other agents, who must then transport themselves to a particular area where they may attempt to make face-to-face contact with the suspect. While the data is being relayed and other agents are moving into position, the persons whose images are detected by the surveillance device remain free to choose their route of travel through an open expanse of desert.

And so long as they maintain this freedom of movement, such persons still have a realistic opportunity to choose a path through which they can enter a "blind spot" and evade apprehension by any agents who are summoned to the scene. In these respects, there are holes in the surveillance technology just as there are holes in the border fence itself, and a person seeking to circumvent the former technology is acting just as surreptitiously as a person seeking to circumvent the latter.

For these reasons, I conclude that a person's detection by a remote or automated surveillance device located three miles away from the border does not, in and of itself, amount to a "constraint emanating from the government that would otherwise prevent her from physically passing on." <u>Correa</u>, 901 F.2d at 1172.  However constant it may be, the stream of data from such a surveillance device does not automatically place an alien in the grasp of Border Patrol agents.

Instead of applying a *per se* rule that equates "official restraint" with "constant surveillance," I consider the fact of such surveillance along with the totality of the circumstances in order to determine whether an alien is sufficiently "free from official restraint" to be found guilty of illegally reentering the United States under 8 U.S.C. § 1326. In addition to facts concerning the manner of surveillance (such as the capabilities of the technology at issue and its distance from the border), the totality of the circumstances also may include a larger array of facts concerning the features of the area in question, including the presence and effectiveness of any physical barriers, the number of Border Patrol agents on patrol, the frequency and volume of alien traffic, and any environmental conditions (such as poor lighting or bad weather) which may affect the situation.

Under this approach, the Government is not necessarily required to present a comprehensive picture concerning all of the above factors in order to meet its burden of proving that a defendant was "found in the United States" within the meaning of 8 U.S.C. § 1326.  Ordinarily, the fact that a defendant is apprehended after jumping a border fence and taking a number of steps into the United States may be sufficient, in and of itself, to support a reasonable inference that the defendant entered the United States free from official

17

restraint.  In order to dispel the normal inferences to be drawn from this fact, a defendant must come forward with some affirmative evidence to show that he or she was never free from official restraint at any time while he or she was physically present in the United States. And in the absence of such affirmative evidence of constant official restraint, the Government "need not respond to a defendant's 'free floating speculation that he might have been observed the whole time.'"  United States v. Saldana-Beltran, 213 Fed. Appx. 540, 541 (9th Cir. 2006) (quoting Castellanos-Garcia, 270 F.3d at 776).

In this case, Defendant primarily relies on the theory that the surveillance from Agent Hernandez's infra-red camera was enough to place him under "official restraint" during the entire period between the time he jumped the border fence and the time he was actually taken into custody by Border Patrol agents.  While Defendant has presented some affirmative evidence to support the inference that he was under surveillance by Agent Hernandez as the agent viewed the thermal-imaging data from an infra-red camera located three miles away, I nevertheless conclude that the totality of the circumstances concerning Agent Hernandez's surveillance do not add up to "official restraint."  Notwithstanding the presence of Agent Hernandez's infra-red camera, the persons whose thermal images appeared in that camera remained free to roam an open desert area in search of a "blind spot" where they could evade apprehension by any government agents who were summoned to the scene.  Under these circumstances, it is reasonable to infer that a defendant who is apprehended in an open desert area within the United States was free from official restraint for some period of time prior his apprehension.

In an attempt to dispel this inference, Defendant points to his own testimony in which

he claimed that he did not make it past the railroad tracks and down into the "blind spot" behind Picnic Hill before he was apprehended by Border Patrol agents.  Under the Court's analysis, however, it does not matter whether the Defendant actually made it to the "blind spot" behind Picnic Hill before he was apprehended, because even if he did not make it to that point, the mere existence of a constant stream of thermal-imaging data from an infra-red camera located three miles away was not enough to constitute official restraint.  The question is not whether Defendant actually did evade apprehension (in which case he would not be appearing in court on an illegal reentry charge), but whether he had a *reasonable opportunity* to evade apprehension when he became physically present in this country and began his walk across the open desert.  In this case, I conclude that the Defendant did have such an opportunity, notwithstanding the presence of his thermal image on the screen of an infra-red camera three miles away.  It follows that any defense based on the infra-red camera surveillance must be rejected in this case.

At trial, Defendant also attempted to develop an alternative theory under which he contends the Government has not met its burden of proof because none of the Border Patrol agents who testified at trial indicated that they had an independent and specific recollection of the details of how they apprehended him.  I reject this alternative theory and conclude that the absence of specific trial testimony from the Border Patrol agents concerning the details of Defendant's apprehension is not dispositive.  By Defendant's own admission, he was apprehended after jumping the border fence and taking about thirty steps into the United States.  Under the analysis provided above, that admission is enough to support a reasonable inference that he was "found in the United States" for purposes of 8 U.S.C. § 1326.

19

Apart from admitting his own conduct and presenting evidence about the infra-red camera operated by Agent Hernandez, Defendant did not elicit testimony giving any specific details about where any other Border Patrol agents were positioned at the moment he jumped the fence or at any other time before he was apprehended.  In particular, he points to no "'affirmative evidence that he was under constant visual observation by a border agent'" other than Agent Hernandez.  Saldana-Beltran, 213 Fed. Appx. at 541 (unpublished disposition quoting Bello-Bahena, 411 F.3d at 1091).  He also points to no evidence that there were any physical barriers which limited his direction of travel in the United States to a specific point of egress which was guarded by a Border Patrol agent.

In the absence of affirmative evidence to support an alternative defense theory that the Defendant was under "official restraint" due to the actions of another Border Patrol agent besides Agent Hernandez or due to the presence of some physical barrier, the Government is not required to come forward with more specific testimony to rebut these speculative possibilities.  See Castellanos-Garcia, 270 F.3d at 776.  The Government's burden of proving each of the essential elements of illegal reentry beyond a reasonable doubt does not require it to rebut a speculative defense theory with specific evidence concerning the exact route that Defendant took and the exact location where every Border Patrol agent in the sector stood in relation to that route.  See Saldana-Beltran, 213 Fed. Appx. at 541 (citing Castellanos-Garcia, 270 F.3d at 776).  It follows from the above reasoning that Defendant was free from official restraint from the time he crossed the border until the time of his apprehension by the Border Patrol agents.

III.    **CONCLUSION**

For the foregoing reasons, I find that the Government has met its burden of proving the Defendant is guilty of the crime charged in the *Indictment* beyond a reasonable doubt, and I deny the Government's *Motion in Limine* [Doc. 21].

**IT IS, THEREFORE, ORDERED** that Defendant's unopposed written waiver of his right to a jury trial is **APPROVED** pursuant to Fed. R. Crim. P. 23(a), as stated on the record before the trial commenced.

**IT IS FURTHER ORDERED** that the Government's *Motion in Limine* [Doc. 21] is **DENIED**.

**IT IS FURTHER ORDERED** that the Defendant, Jesus Dominguez-Lopez, is found **GUILTY** of the crime of illegal reentry as charged in the *Indictment*.

**SO ORDERED** this 14th day of May, 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
UNITED STATES DISTRICT JUDGE